## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| In re: | |
| Teresita Tiongson<br>Debtor | Case No. 22-11540-KHK<br>(Chapter 7) |
| Janet M. Meiburger, Trustee<br><br>Plaintiff<br><br>v.<br><br>Rosario Suazo,<br>Nina Avielle Davis, and<br>Danielle Andrea Davis<br><br>Defendants | AP No. 24-01007-KHK |

### MEMORANDUM OPINION

The matters before the Court are (i) the Second Motion for Stay Pending Appeal filed by the defendants in Adversary Proceeding No. 24-01007 (Case No. 24-01007, Docket No. 56) (the "Second Stay Motion") and the response thereto; and (ii) the Debtor's Motion to Convert to Chapter 13 (Case No. 22-11540, Docket No. 37). The Court held an evidentiary hearing on the matters on May 13, 2025. The Debtor appeared and testified at the hearing. For the reasons that follow, the Court will deny the defendants' Second Motion for Stay Pending Appeal and deny the Debtor's Motion to Convert.

### Background

This order assumes familiarity with the underlying facts, so the Court will not exhaustively recite them here. In summary, prior to the matters coming before the Court, the Debtor, Teresita Tiongson was involved in litigation with the Chapter 7 Trustee wherein the Trustee sought to (i)

declare the Debtor as the sole beneficial owner of the real property located at 4563 King Edward

Court, Annandale, VA 22003 at the time that she transferred the property to her granddaughters

and (ii) avoid the transfer to the granddaughters.  The Trustee originally asserted both intentional

and constructive fraudulent transfer actions in her complaint, but on summary judgment the

Trustee only pursued the constructive fraud theory.  *See* Case No. 24-01007, Docket No. 22.   The

Trustee was successful in the litigation and this Court granted summary judgment in favor of the

Trustee, declaring the Debtor the sole owner of the property at the time of the relevant transfer and

avoiding the transfer as constructively fraudulent under section 55.1-401 of the Virginia Code.[1]

The Court notes that the defendants attempted to defeat summary judgment by introducing a

declaration from the Debtor[2], but the Court excluded the declaration under the sham affidavit rule

because it directly contradicted the Debtor's previous deposition testimony.  The contradictory

statement related to whether or not the debtor owned stocks, bonds and other investments.  In her

deposition Ms. Tiongson indicated she owned none, but her declaration in opposition to the

Trustee's summary judgment motion asserted she owned a brokerage account which she used to

purchase stocks.

Following the Court's grant of summary judgment in favor of the Trustee, the defendants

noted an appeal and sought a stay pending the outcome of that appeal.  Case No. 24-01007, Docket

No. 30 ("First Stay Motion").  At the hearing on the First Stay Motion, the Trustee and counsel for

the defendants, who is also counsel for the Debtor, announced that they had agreed to terms of a

stay pending appeal.  Those terms required the defendants to (i) pay the Trustee $2,100,

---

[1] While the Virginia Code does not call this action a constructively fraudulent transfer, the elements -- a transfer
made without consideration deemed valuable in law, made while insolvent, or if the transfer rendered the debtor
insolvent -- are substantially similar to the elements necessary to establish what is referred to in Bankruptcy parlance
as a constructively fraudulent transfer.  See 11 U.S.C. § 548(a)(1)(B).
[2] Case No. 24-01007, Docket No. 24-1.

representing six months of insurance payments for the property, and (ii) provide the Trustee with documentation showing that the mortgage on the property is current. Case No. 24-01007, Docket No. 52, pg. 2 (the "First Stay Order"). The First Stay Order required those conditions to be met within ten days of the entry of the Order. *Id*. If the defendants failed to satisfy those conditions within the permissible time period, the Trustee was permitted to file a certification to that effect, and upon such filing, the stay granted by the First Stay Order would terminate. The First Stay Order also provided that if the appeal had not been decided by March 1, 2025, the defendants would be required to make an additional $2,100 payment and provide further documentation demonstrating that the mortgage was current (the "Additional Stay Requirements"). *Id*. The deadline for the Additional Stay Requirements was March 15, 2025. Similar to the first deadline, upon the Trustee's certification that defendants failed to meet the Additional Stay Requirements, the stay would terminate. *Id*. at 3.

On April 14, 2025, the Trustee filed a certification indicating that the defendants had failed to comply with the Additional Stay Requirements. Case No. 24-01007, Docket No. 55. In her certification, the Trustee indicated that she emailed counsel for the defendants on March 25, 2025 and received a response, but nevertheless did not receive the payment or the mortgage documentation. *Id*. at pg. 3. As a result of the Trustee's certification, and per the terms of the First Stay Order, the stay pending appeal terminated on April 14, 2025. In response to the Court's questioning at the hearing as to why the defendants did not comply with the Additional Stay Requirements, the defendants' counsel asserted that he was to blame for the failure.

On April 17, 2025, the defendants filed the Second Stay Motion. The Second Stay Motion largely mirrored the arguments made in the First Stay Motion. On April 30, 2025, the Debtor filed a motion to convert her case from chapter 7 to chapter 13, which the Court agreed to hear on an

expedited basis so that it could be heard alongside the Second Stay Motion.  Case No. 22-11540,

Docket No. 37 (Motion to Convert), Docket No. 39 (Order Granting Expedited Hearing).  On May

10, 2025, the Debtor filed amended Schedules I and J, wherein the Debtor asserts that her

granddaughters, who have been living in the property for several years and who are defendants in

the adversary proceeding, will now be contributing a combined $2,000 a month, and that in total,

the Debtor's disposable monthly income will be $6,946.50.

At the hearing, the Debtor testified that she works north of one hundred hours a week and

that she can propose a confirmable plan if she maintains those hours for the duration of the plan.

Despite the Debtor's assertion that her granddaughters would provide a $2,000 contribution to the

household, the granddaughters did not appear and testify at the hearing.  The Debtor, however,

provided testimony regarding the granddaughter's employment history, establishing that the elder

granddaughter had been employed for several years, and, both granddaughters had been employed

during most of the Debtor's bankruptcy.

Based on the asserted income levels, Ms. Tiongson would need to commit to a five-year

plan.  *See* 11 U.S.C. § 1322.  Additionally, if the Debtor were to fall ill or otherwise miss days of

work during the five-year period, she might have problems making the necessary payments.

Despite the steep hill the Debtor would need to climb in order to fund the plan, there is no dispute

before the Court as to whether the asserted income levels could support in a confirmable plan.  Nor

is there a dispute regarding the Debtor's income levels.  However, an issue that is before the Court

is whether the Debtor is seeking to convert the case in good faith.

### Parties Positions

    a.  The Second Stay Motion

<u>The defendants' positions</u>:

The defendants assert that a stay pending appeal is warranted in this matter because (i) they are likely to succeed on appeal; (ii) the defendants believe they will be irreparably injured absent a stay as they will lose the home they all currently reside in; (iii) the defendants maintain that no other parties will be substantially injured or harmed by the stay, only inconvenienced; and (iv) the defendants believe the public interest is served by having a trial heard on the merits to ensure that the appeal is not a "mere academic exercise". Case No 24-01007, Docket No. 56. The defendants make the majority of their argument under the likelihood of success prong of the request for a stay pending appeal.

In particular, the defendants assert that the Court misapplied resulting trust law because it, according to the defendants may only be used as a shield by defendants, not as a sword by a trustee. *Id*. at 6. In support of this proposition, the defendants cite to *In re Bassett*, 221 B.R. 49 (Bankr. Conn. 1998). The defendants also cite to *Weisbart v. Momphard, Adv. (In re Munro)*, No. 10-43542, 2013 WL 74414, at *3 (Bankr. E.D. Tex. Jan. 7, 2013) for the prior proposition and the proposition that the property interest at issue was not property of the estate when the case was filed, asserting that there was no mechanism that brought the property into the estate. The defendants also cite to *Hardesty v. Horn*, 606 B.R. 747 (Bankr. S.D. Ohio 2019) for the proposition that the only way the Trustee could bring the property interest into the estate is by using her strong-arm powers under section 544(a)(3) of the Bankruptcy Code.

The defendants also argue that the Court erroneously found that Ms. Tiongson was insolvent at the time of the relevant transfer because, according to the defendants, the Court arrived at its insolvency conclusion by improperly relying only on amounts listed in the proofs of claims and schedules in the case and "assuming that whatever debt the debtor had when she filed her

bankruptcy case was more or less the debt the debtor possessed some two years prior when the transfer was made."[3]  The defendants cite to *Limor v Anderson*, No. 18-8028 (B.A.P. 6th Cir. Mar 28, 2019) and *In re Strickland*, 230 B.R. 276 (Bankr. E.D. Va. 1999) for the proposition that reliance on schedules alone is improper because schedules only show the debt owed on the petition date.[4]  The defendants maintain that the Trustee failed to provide any other evidence that the debts at issue were owed at the time of the transfers, citing to *Roach v. Skidmore Coll.*, 566 B.R. 624 (Bankr. S.D. Ga. 2017).  The defendants also assert that using retrojection and protracted time periods between the petition date is impermissible to establish insolvency, citing to a Sixth Circuit Court of Appeals decision.[5]

Additionally, the defendants take issue with the Court's inclusion of two notes payable to her granddaughters in its insolvency analysis.  The defendants argue that the notes were not attached to the initial summary judgment motion or complaint, asserting that the defendants could not create an issue of fact because of the timing of the Trustee raising them.

The defendants also take issue with the Court's assessment of the value attributable to Ms. Tiongson's assets, in particular that the Court attributed no value to the Debtor's business, Alpha Health Resources, and the Court's exclusion of any consideration of the alleged E-Trade brokerage account the Debtor referred to in her declaration in response to the Trustee's motion for summary judgment.  In support of the defendants' argument that a value should have been assigned to Alpha, the defendants cite to *Lanik v. Smith*, Adversary No. 15-02023, Case No. 14-10468 (Bankr. M.D.N.C. Jan 27, 2017). Finally, the defendants argue that the Court mechanically applied the

---

[3] Docket No. 56 – Second Motion Requesting Stay Pending Appeal p. 8.
[4] The defendants also string cite to *Burdick v. Lee*, 256 B.R. 837, 841 (D. Mass 2001), *In re Mattingly*, No. 06-4095, 2007 WL 2229379, at *2-3 (Bankr. W.D. Ky. Aug 1, 2007) and *In re Tompkins*, 428 B.R. 713 (W.D. Mich. 2010).
[5] The defendants identify the case as In re Scarbrough case but do not otherwise provide a full citation.

sham affidavit rule and improperly excluded the declaration the Debtor filed in opposition to the

Trustee's Summary Judgment Motion.  The defendants assert that Ms. Tiongson was, in essence,

confused in her prior deposition when she testified that she did not have stocks, bonds or similar

investments.[6]   In support thereof, the defendants point to the Debtor having said "I do not

remember" or "I am not sure" in response to other questions asked by the Trustee during the

relevant deposition.  The defendants also maintain that the Debtor was not examined carefully

enough on the issue.

        The Trustee's positions:

        The Trustee asserts that a stay is not warranted under the circumstances because the

defendants are not likely to succeed on appeal, and if the Court does impose a stay, that the stay

should be conditioned on a) the defendants keeping the mortgage current, b) the defendants

depositing with the Trustee an amount equal to the costs the estate has and will incur to insure the

property for one year, and c) the defendants depositing with the Trustee $50,000 to cover any

potential loss in value of the property due to the stay.[7]   On the merits, the Trustee argues that the

defendants took no discovery in this case and produced no usable evidence of their own and that

they merely seek to relitigate issues that were already decided.  The Trustee argues that to date no

explanation has been offered to explain the contradiction between the Debtor's deposition

testimony and the declaration that was excluded under the sham affidavit rule, and that the Debtor

---

[6] The defendants support this argument by citing to Baer v. Chase, 392 F.3d 609 (3d Cir. 2004), Lane v. Celotex
Corp. 782 F.2d 1526 (11th Cir. 1986), Essex Ins. Co. v. Schooner's Bar & Grill, Inc., Civil Action No. 3:15-15881
(S.D. W. Va. Feb 28, 2017), Boggs v. Cintas Corp. No. 2, Civil Action No. 2:11-0150 (S.D. W. Va. Apr 09, 2012).
[7] At the time of the entry of this decision, it appears that the Trustee has obtained a contract to sell the property for
$550,000. In the pending motion to sell, the Trustee estimates that after the costs of sale and payment of all valid
liens the estimated net proceeds to the bankruptcy estate would be approximately $252,557.00.  Case No. 22-11540,
Docket No. 44, p. 3.

has likewise failed to provide any other evidence regarding the E-Trade account. The Trustee maintains that the Court's insolvency analysis was supported by the undisputed facts in the case.

Aside from the merits, the Trustee argues that the issue of a stay pending appeal has already been decided by the First Stay Order and that therefore, the terms of the First Stay Order constitute the law of the case and forecloses additional inquiry into a stay pending appeal.

b.  The Motion to Convert

The Debtor's position with respect to the motion to convert is that absent bad faith, she has a right to convert the case and that she is eligible to be a chapter 13 debtor. The Trustee did not file a formal objection, but at the hearing she highlighted that Ms. Tiongson would need to basically work north of 100 hours a week for the duration of the plan and never miss a day of work or incur an unexpected expense to be able to propose a confirmable plan.

## Conclusions of Law

The Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(1).

a.  The Second Stay Motion

The Court will first address the Second Stay Motion.

The standard for obtaining a stay pending appeal requires a party to show "(1) that he will likely prevail on the merits of the appeal, (2) that he will suffer irreparable injury if the stay is denied, (3) that other parties will not be substantially harmed by the stay, and (4) that the public interest will be served by granting the stay." *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970). All four of these requirements must be met for an appellant to obtain a stay. *Schelin v. Malloy (In*

*re Malloy)*, Adv. Pro. No. 23-03043-KRH, 2024 WL 169172, at \*2 (Bankr. E.D. Va. Jan. 12, 2024).

Even if the four elements are established, the granting of a stay is discretionary. *In re Hopeman*

*Bros.*, Inc., 667 B.R. 101, 105 (Bankr. E.D. Va. 2025).

On the first requirement, the Court finds that there is no likelihood of success on appeal.

The Court will begin with the argument that no mechanism existed to bring the property at issue

into the estate and that resulting trust law may only be used defensively. The defendants' cited

authorities do not stand for that proposition, and in fact, undercut the defendants' argument. First,

the *Weisbart* case involved a debtor that only held legal title to property, not a debtor that was

alleged to hold equitable or beneficial ownership of the interest at issue. Further, the defendant

fails to acknowledge that the *Weisbart* opinion acknowledges that resulting trusts arise the instant

a deed is taken. *In re Munro*, No. 10-43542, 2013 WL 74414, at \*3 (Bankr. E.D. Tex. Jan. 7, 2013).

Accordingly, that case is distinguishable and does not establish that the defendants have a

likelihood of success on appeal. Further, the defendants' view of the law does not align with the

text of section 541(a)(1) of the Code, which includes in property of the estate, all equitable interests

of the debtor in property. 11 U.S.C. § 541(a)(1). In other words, section 541(a)(1) and the resulting

trust that arose the "instant [the] deed [was] taken]" is the mechanism that brought the property

into the estate. The argument that resulting trust law can only be used as a shield and not a sword

seems to be based on section 541(d) of the Bankruptcy Code which excludes from the estate

property in which the debtor only holds bare legal title. But here, in contrast to the *Weisbart* and

the *Basset* cases, both of which spoke of debtors that only held legal title, the Debtor in the instant

case holds the equitable or beneficial interest in the property, rendering section 541(d) irrelevant

to the inquiry. The Court therefore rejects the sword and shield argument as contrary to the

Bankruptcy Code and finds that it does not demonstrate a likelihood of success on appeal.

With respect to the defendants' argument that only the Trustee's strong-arm powers under section 544(a)(3) could be used to bring the property into the estate, that argument was based on the circumstance where a constructive trust arose but was not recognized until post-petition, a premise that does not apply to the facts of this case because constructive trust law was not applied in the Court's summary judgment ruling.   Accordingly, that argument and the defendants' supporting citation to the strong-arm decision in the *Hardesty* case fails to demonstrate a likelihood of success on appeal.[8]

With respect to the defendants' challenges to the Court's insolvency ruling, the Court is unpersuaded that the defendants will succeed on appeal.  The parties agree that a balance sheet test is appropriate to determine whether Ms. Tiongson's liabilities exceeded the value of her assets that remained after the transfer.  Defendants assert, erroneously, that the Court merely assumed that whatever debt the Debtor had when she filed her case was more or less the debt, she possessed some two years prior at the time of the transfers. Defendants cite numerous cases for the proposition that schedules cannot control the inquiry.  Here, they did not control the inquiry, because the Court also relied on the proofs of claims and, most importantly, the supporting documents attached to the proofs of claims.  *See* Hr. Transcript pp. 48- 50 (court analyzing the relevant debts, when they were incurred, any reductions in balances and whether the record showed that balances had been paid down and ran back up after the transfer).

The defendants repeatedly state that the Court relies on assumptions to make its insolvency ruling, while ignoring that the Court analyzed each debt.  Contrary to the defendants' assertions, the Court analyzed when the debts were incurred, the supporting documents which included

---

[8] The Court further notes that the strong-arm argument presumed that no other mechanism brought the property into the estate.  As a result, and in addition to the distinguishable factual and legal basis for the ruling in the *Hardesty* case, the argument fails to demonstrate a likelihood of success on appeal.

account statements, the proofs of claims, and the undisputed facts before the Court for purposes of summary judgment, none of which included evidence of paying down and then reincurring debts. For each debt that was included in the analysis, the undisputed record before the Court was that the debts owed were largely, if not exactly, the same before and after the transfer was made.

Additionally, the defendants now, incredibly, question why the Court cannot assume that the reason some of the debts were not significantly lower than the original amounts that were borrowed was because the "debtor paid down a substantial portion of the loan…and then 'ran up' the balance once again " after the transfers were made.  Case No. 24-01007, Docket No. 56, pg. 14.  The Court notes that in its summary judgment ruling it expressly found that there was nothing in the record to suggest that debt amounts were paid down prior to the transfer, but then subsequently ran back up after the transfer.  The Court also separately noted that the record did not support that Ms. Tiongson had paid down her debts to overcome the minimum possible difference between the asserted value of the Debtor's available assets after the transfer and Ms. Tiongson's liabilities by August of 2020, and then reincurred the same amounts after the relevant transfer was made.    Hr. Transcript pp. 48-50.  As a result, Ms. Tiongson's minimum liabilities at the time of the transfer exceeded the value of the available assets, and therefore, she was rendered insolvent by the transfer.

The Court notes that its original stated calculation of the approximate deficits was based on only the values of the Wells Fargo Checking Account and the E-Trade account, and the Trustee's assertion that the outstanding liabilities at the time of the debt were $347,171.86, which number however, was incorrect, but the conclusion is still the same.

Value of Liabilities:

With respect to the more generous interpretation of what was owed at the time of the transfer, the debts should have totaled $334,744.20, which is made up of (1) the two $37,500 promissory notes[9], (2) the OnDeck loan[10] which account statements showed at a balance of $111,181.34 prior to and after the transfer; (3) the M&T loan, which the Court credited at a balance of $99,260.70,[11] representing only the principal amount outstanding on the loan (excluding the interest and late fees that are shown on the proof of claim and attached documentation, and assuming that the Debtor achieved all reductions in principal through payments made between the incurrence of the loan in November of 2019 and the transfer in August, even though such principal reduction seems unlikely given that the payment terms of the loan called for interest only payments during the first 48 months of the loan);[12] (4) the PNC loan credited similarly to the M&T loan at a "principal only" balance of $47,350.90,[13] and (5) the student loan claim of $1,951.26.[14]

On the high end, using the proof of claim balances, the M&T loan would be credited at a balance of $111,357.78 and the PNC loan would similarly be credited at a balance of $49,632.94. The total of the higher calculated liabilities would be $349,123.32.  As the Court acknowledged, the true amount of the M&T and PNC loans lies somewhere between the generous lower value and the higher value, but regardless of where that number falls, it is not enough to render the Debtor solvent immediately following the transfer.

Value of Available Assets:

---

[9] Docket No. 25 – Exhibits 16 and 17. The Court originally misspoke during its oral ruling, indicating the notes were for $35,000 each.
[10] Claim 12-1 Part 2 pg. 19.
[11] Claim 7-2 Part 2 p.52.
[12] See Case No. 22-11540, Claim No 7-2, p. 12.
[13] Claim 9-1 p. 4.
[14] Claim 1-1 p. 4.

After the transfer, using the values asserted in Ms. Tiongson's declaration, the Debtor's assets available to creditors had a value of $268,353.46, consisting of the $125,000 E-Trade account,[15] the $134,692.84 Wells Fargo Checking Account[16] and the $8,660.62 Savings Account.[17]

The lower end "generous" deficit would therefore be $ -66,390.74.  Using the higher liabilities, the deficit would be $-80,769.86. Again, as the Court noted, the true number lies somewhere in between, but that calculation assumes the Court had allowed the declaration to create a genuine dispute of material fact.  If, for example, the E-trade account is not considered at all, the deficit grows by $125,000.  If the funds in the checking account or savings account are found to belong to the granddaughter, as the Trustee maintains, the deficit also grows.

Nothing in the record explained why Ms. Tiongson's debts were largely the same amounts prior to and following the transfer at issue.  Further, the defendants' theory of paying down and running up the debts are not arguments that were made at the summary judgment hearing or in the defendants' responses to the motion.  They are pure speculation, unsupported by the record and are raised after the fact to attempt to conjure up a genuine dispute of material fact with respect to the debts the Debtor owed at the time of the transfer.  Mere conjecture, speculation and denials are not

---

[15] Case No. 22-11540, Docket No. 24-1.

[16] Id. at Docket No. 25 pp. 5 and 57

[17] The Court's original ruling did not credit the Debtor's assets with the savings account balance.  The Debtor's declaration asserted that the savings account had a balance of $8,096.  The Trustee's account statement for the account showed a balance at the relevant time of $8,660.62.  Docket No. 25, pgs. 5, 43.  Further, the Court notes that it was the Trustee's position that the majority of the funds in the checking account and all of the funds in the savings account belonged to the Debtor's granddaughter.  The Court did not include a balance for this account in calculating assets in its original ruling because the account balance (and the Trustee's proof of a higher balance) were raised in connection with the excluded declaration and it ultimately did not change the conclusion regardless of which value was used, but for purposes of laying out the undisputed record for purposes of analyzing the likelihood of success on appeal, just as with the checking account, the Court will assume, in the light most favorable to the Debtor and the defendants, that none of the money belonged to the Debtor's elder granddaughter, as asserted by the Trustee, and include the higher balance shown on the account statement in the calculation of the Debtor's assets.

sufficient to create a genuine issue of material fact. Therefore, the Court finds that this challenge to the Court's insolvency analysis fails to demonstrate a likelihood of success on appeal.

The defendants also erroneously argue that the Court assumed that the notes owed to the granddaughters were still owed as of the time of the transfers and at the time of the bankruptcy, but that is not what happened. The Trustee produced undisputed evidence of debts, and the defendants failed to create a genuine dispute of material fact with respect to the existence of that debt at the time of the transfer. No evidence of payment or even an allegation or argument in support of payment was made.   In fact, the defendants conceded that the notes both existed and that there was no contrary evidence indicating that they were not incurred or that they were paid off. Hr. Transcript p. 29:15-20.

The defendants assert that no response was made on this point because the notes were raised in the Trustee's reply to summary judgment, but the defendants do not cite any authority that stands for the proposition that the Court cannot rely on documents attached to the reply for summary judgment.  The Court notes that in the context of the two stay motions, the defendants are raising for the first time their substantive arguments regarding the resulting trust law, which were not argued at summary judgment.  The defendants think it is proper to raise new arguments that were not made in the original decision, but that it is improper for the Court to consider matters raised in the context of the summary judgment motion and responses thereto, all of which were before the Court prior to its summary judgment decision.  The defendants' assertion, that they essentially had no opportunity to dispute the notes, lacks credibility.  The defendants had ample opportunity to respond to the notes.  The Trustee's reply was filed on August 5, 2024, and the hearing on the Motion for Summary Judgment did not take place until August 20, 2024. The defendants' counsel has not hesitated to file replies in other matters before this Court mere days

before the hearing in some cases, and even frequently cites authority and arguments not in his briefs (like at the summary judgment hearing) so it is disingenuous for defendants' counsel to represent that he had no ability to respond to the existence of the notes here when he had over 14 days to address the asserted notes.

With respect to assets, the defendants assert that the Court erred by assigning to Ms. Tiongson's assets only the property and Alpha Health Resource, LLC, the Debtor's business at the time of the transfer.[18] Further, the defendants assert that the LLC was worth something and should not have been assigned a value of zero. For this proposition, the defendants assert that, prior to the transfers when the commissioner of accounts entered into settlements regarding Ms. Tiongson taking clients from her deceased daughter's business over to her business, the commissioner assigned value to the daughter's business and that therefore, Ms. Tiongson's LLC must also have value. The defendants, in making this argument, completely discount the severe financial distress that Alpha Health was experiencing, as demonstrated in the record without contradiction. The LLC could not meet its obligations and Ms. Tiongson had to take out loans and infuse significant money into the business in order to meet those obligations.  In short, the Debtor's LLC was clearly insolvent, had liabilities far beyond its ability to pay, as evidenced by the additional debt it had to incur just to pay its ordinary costs and expenses.[19] The defendants suppose that value attributed to the daughter's business automatically means that the Debtor's LLC likewise has value, however this argument fails to account for the severe financial distress experienced by Alpha Health that was not shown to be present with respect to Ms. Tiongson's daughter's company.

---

[18] To be clear, the Court found in its ruling that the Debtor was rendered insolvent by the transfer of the property, so the property's value was, in essence, excluded from the deficit between the Debtor's assets and liabilities for purposes of determining whether insolvency resulted from the transfer.

[19] See Case No. 22-11540, Docket No. 22 Exhibit 6 – Deposition of Teresita Tiongson pp. 5-19.

Further, it is undisputed that a large portion of the Debtor's debt sprung from her guarantees of the business obligations of her business, and it was failing and eventually shut down. The defendants' argument that the LLC should be valued as a going concern is belied by that fact. In any event, a business that relied on customers, that could not meet its obligations based on those customers, that Ms. Tiongson's own deposition testimony indicated required substantial cash infusions and business loans to stay afloat and that shut down shortly after the relevant transfers, simply cannot provide value sufficient to offset its obligations that were then passed on to the Debtor due to guarantees. Even if the Court assumes that the LLC had assets of some value, the existence of the business debts that drove Ms. Tiongson into bankruptcy clearly offset any value that was present. It is telling that the business shut down, that its loans were in default and that even after that closure, there was no substantial paydown of the loans. If the business had valuable assets as the defendants' argument suggests, it is curious that the value was not realized in any way by Ms. Tiongson after she closed the business.

Based on the foregoing, the Court finds that there is no likelihood of success on the insolvency point.

With respect to the sham affidavit ruling, the Court likewise finds that there is no likelihood of success on this point. The rule provides that where a party has been examined at length on deposition, that party cannot defeat summary judgment by simply submitting an affidavit contradicting her prior testimony. *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct."). Among the cited authorities the defendants raise, the defendants make clear that the Fourth Circuit requires a clear inconsistency between the original testimony and the subsequent affidavit. The defendants, in

conclusory fashion, argue that Ms. Tiongson was not carefully examined on the points of the brokerage account and that therefore the rule should not have been applied. The defendants believe that because the Debtor was asked only one time about stocks, bonds or similar investments, that the sham affidavit rule should not bar her attempt to introduce a declaration to create a genuine dispute of material fact with respect to the assets she had at the time of the transfer. The defendants assert that because at one time Debtor asserted that she moved money to the account, her answer that she had no stocks, bonds or other similar investments and then later declaration to the contrary, are not inconsistent. Of course, transferring money to a brokerage account does not necessarily mean that the Debtor has investments. The cash could be sitting there uninvested, for example.

But as defendants conceded at the hearing, even that was apparently not the case. Ms. Tiongson apparently had purchased stocks using the account. The defendants' counsel even conceded at the hearing on the motion for summary judgment that he had documentation (that he had not submitted with the declaration) to show that the Debtor had invested in stocks but that he chose not to attach it to the declaration. That evidence was not in the record and the Court thus could not consider it when ruling on the sham affidavit rule.

The Court, therefore, finds that the defendants are unlikely to succeed on this point. The deposition was quite clear in its question regarding the ownership of stocks or bonds, which Ms. Tiongson indicated she did not own. Further, the Debtor was in fact "examined at length" for approximately 1 hour on numerous topics, including her liabilities, her business, her assets and the existence of any stocks, bonds or anything of the like. *See* Case No. 24-01007, Docket No. 22, pgs. 39-50 (Transcript of Deposition of Debtor). Then the subsequent declaration directly contradicted Ms. Tiongson's prior statement by indicating that the Debtor had a brokerage account at the time of the transfers, and as defendants' counsel concedes, the brokerage account had stocks

in it. There is no question and there can be no question because no other evidence in the record contradicts this point: the statements are inconsistent without explanation and the Court properly ruled that the declaration could not be used to create a genuine issue of material fact.  As a result, the Court finds that there is no likelihood of success on the sham affidavit issue.[20]

The Court will next address whether the defendants will be irreparably injured absent a stay.

The defendants assert that the Debtor and her granddaughters will be left homeless if this Court does not issue a stay pending appeal.  When the First Stay Motion was filed, the Court was more sympathetic to this point, but at this stage, the equities have shifted. The defendants already obtained one stay pending appeal based on agreed conditions, which were not met.  Although the Court acknowledges that losing the family home is likely harm, at this point, any harm they will suffer is due to their own failure to abide by the agreed conditions of the First Stay Order. Moreover, it is now clear from the Debtor's amended schedules I and J that the defendants have the income to find another residence, a fact that was not clear when the First Stay Order was issued. These facts negate the asserted irreparable harm of homelessness.  Accordingly, the Court finds that this factor weighs against granting a second stay.

With respect to whether other parties will be substantially injured by the issuance of a stay, the Court notes that the First Stay Order required that the defendants pay over to the Trustee funds to reimburse the estate for costs that had been incurred and cover costs that would be incurred

---

[20] The Court also notes that in its ruling, even though the declaration, which asserted that the Debtor had various assets of value, would not be allowed to create a genuine issue of material fact under the sham affidavit rule, the Court observed that the purported assets listed in the declaration that were not available to satisfy creditor claims should not be included in the solvency analysis. The Court then found that even using the Debtor's stated values for the Wells Fargo account and the brokerage account, the Debtor's liabilities at the time of the transfer exceeded the value of those assets. Hr. Transcript pp. 46-48.

insuring the property. That condition and the other conditions of the First Stay Order were designed to protect the estate from harm resulting from the stay. As previously noted, the Additional Stay Requirements were not met. Therefore, based on the record before the Court, it appears that the estate will be harmed by a second stay in this matter, because it was harmed by the first stay. The Court also notes that if the defendants are not successful on appeal, a stay will merely postpone the sale of the property and thereby delay payment on administrative and other creditor claims. Accordingly, the Court finds that this factor weighs against granting a second stay.

With respect to whether the public interest would be served by a second stay, the defendants assert that the public interest here requires a stay because the public will be well served by having a trial heard on the merits and ensuring that the pending appeal does not prove to be a mere academic exercise. The Court finds that this argument is insufficient because it would essentially mean that all appeals of summary judgment orders would be per se entitled to a stay pending appeal. The defendants already received a stay under the First Stay Order and failed to abide by the Additional Stay Requirements under that Order. The Court also notes that the Debtor has now sought to convert the case to one under chapter 13, which appears to be a delay tactic employed to prevent the Trustee from selling the property. The Court will separately address whether that conversion attempt was made in bad faith. But for purposes of the Second Stay Motion, the Court finds that based on the record before the Court, the public interest does not weigh in favor of granting the defendants a second stay pending appeal when they chose not to comply with the requirements of the First Stay Order.

Accordingly, the Court finds that the defendants have failed to meet the requirements for a stay pending appeal and the Court will therefore deny the Second Stay Motion. Because the Court

has addressed the merits of the stay request, the Court declines to reach the law of the case issue
raised by the Trustee.

### b. The Motion to Convert

The Court now turns to the Motion to Convert. Section 706(a) of the Bankruptcy Code
allows a debtor to convert a case, as is relevant here, to a case under chapter 13 if the case was not
previously converted. Section 706(d) provides that a case may not be converted to a different
chapter unless the debtor qualifies to be a debtor under such chapter. The right to convert a case
to chapter 13, however, may be forfeited by a debtor who has acted in bad faith either prepetition
or during the chapter 7 phase of the case. *Marrama v. Citizens Bank of Massachusetts*, 549 U.S.
365, 374 (2007). Bad faith conduct must be atypical, and denial of a motion to convert should be
limited to extraordinary cases exhibiting conduct beyond the type of bad faith that would justify
denial of confirmation of a chapter 13 plan for a lack of good faith. *Id*. at 375, n 11. Examples of
conduct sufficient for a bad faith dismissal or denial of a motion to convert to chapter 13 include
but are not limited to fraudulently concealing significant assets. *Id*. at 367.

Here, the question before the Court is not whether the Debtor can possibly confirm a plan.
The question is whether her conduct prepetition and during the chapter 7 phase of her case
demonstrate, under the totality of the circumstances, atypical and extraordinary bad faith conduct
sufficient to forfeit her right to convert her case to chapter 13. The record before the Court
establishes that during the prepetition period, the Debtor engaged in what was a constructively
fraudulent transfer of her home to her granddaughters, which was prejudicial to her unsecured
creditors who are owed north of $300,000. Further, while the Court's summary judgment ruling
was based on a constructive fraud theory, the record before the Court is also sufficient to establish
fraudulent intent. First, the Court notes that transfers between related parties give rise to close

scrutiny, and a transfer made without adequate consideration gives rise to a presumption of actual fraudulent intent. *In re Smoot*, 265 B.R. 128, 137 (Bankr. E.D. Va. 1999), subsequently aff'd sub nom. *Tavenner v. Smoot*, 257 F.3d 401 (4th Cir. 2001).  Here, the transfer clearly meets these requirements as it was between a grandmother and her granddaughters and was made for no consideration.  While the Court is not deciding an intentional fraudulent transfer action, the Court merely highlights that the Debtor's actions are exactly the types of actions that establish intent to defraud.

Additionally, as demonstrated by the conflicting deposition testimony and later declaration regarding the Debtor's brokerage account, the Court is left with the inescapable conclusion that the Debtor has been dishonest about her assets at the time of the transfer.  As the Trustee indicated in her opposition to the Second Stay Motion, the Debtor has never produced evidence relating to the brokerage account.  Additionally, the Debtor's counsel made clear at the May 13th hearing that the Debtor's plan, even if the case was converted to chapter 13, was to ultimately overturn the Court's ruling on appeal.  The result of that maneuver would be that the Debtor would continue to pay the mortgage on the relevant property, but the property would not be included in the bankruptcy estate and the Debtor's creditors would receive far less than they would than if the property were sold.  Of course, the Court acknowledges that the Debtor asserts she can propose a chapter 13 plan that would pay creditors at least as much as they would receive if the property were liquidated and that there is no real dispute about whether the Debtor's income, when combined with the proposed contributions from her granddaughters, could be sufficient to fund such a plan. However, the record before the Court establishes that the Debtor and her

granddaughters had similar income while the stay was in place, and yet, the payments required by the Additional Stay Requirements went unpaid.[21]

Further, the Court finds that the Motion to Convert to chapter 13 was not born of a sincere desire to reorganize or pay creditors, but instead as a delay tactic to further prevent the Debtor's creditors from recovering on their claims through the chapter 7 sale of the property. The Motion to Convert was filed after the stay under the First Stay Order terminated, and after the Trustee took steps to begin marketing the property. The timing and the circumstances of the Motion to Convert and the Second Stay Motion, including the defendants' failure to comply with the First Stay Order, demonstrate that they were filed as part of a dual-tracked strategy to effectuate an end-run around the Court's ruling on summary judgment in the adversary proceeding and at the expense of the Debtor's creditors.

While retaining property by paying creditors in accordance with the Code is a common goal in chapter 13, when considering Ms. Tiongson's prepetition fraudulent transfer, her dishonesty in the context of the adversary proceeding during the chapter 7 phase of her case, the Debtor's and the defendants' flippancy toward the conditions of the First Stay Order[22] and the plain reality that the Debtor never intended to use chapter 13 to pay creditors to protect equity in property of the estate or the Debtor (and still does not, considering the Debtor's hopes for the appeal), the Court

---

[21] The Court notes that the Debtor was not a party to the First Stay Order, but it is clear the Debtor and the defendants are acting in concert with respect to their efforts to prevent sale of the property. Indeed, the Debtor, and not the granddaughters, appeared for the May 13, 2025 hearing, and the Debtor and the defendants are represented by the same counsel. The Second Stay Motion even refers to the Debtor as the appellant and cites under the heading "Whether the applicant will be irreparably injured absent a stay", alleged irreparable harm to the Debtor and the defendants as a basis for the request for a stay. *See* Case No. 24-01007, Docket No. 56, pg. 3 ("Debtor will likely prevail on the merits on appeal"); pp. 24-25 ("the Debtor and her granddaughters… will be left homeless). The same features are present in the First Stay Motion. *See* Case No. 24-01007, Docket No. 30, pp. 4 and 25.

[22] Again, the Court acknowledges that the Debtor was not expressly subject to the First Stay Order, but it is undisputed that the Debtor has been paying the mortgage on the property even though the defendants took responsibility for maintaining mortgage under the First Stay Order, and it is clear to the Court that the Debtor and the defendants are acting in concert in their attempts to prevent the sale of the property.

is left with the inescapable impression that the Debtor is attempting to engage in a bad faith use of chapter 13.

The Court reiterates that no adequate explanation was provided for the failure of the defendants to comply with the Additional Stay Requirements beyond counsel saying it was his fault. The Court is mindful that it must consider the totality of the circumstances in denying a motion to convert to chapter 13 based on bad faith, and that the totality of the circumstances, as a general matter, includes consideration of any "advice of counsel defense." *See Sugar v. Burnett*, 130 F.4th 358, 377 (4th Cir. 2025). In *Sugar* the Fourth Circuit Court of Appeals found that it was error for the bankruptcy court to dismiss a chapter 13 case for bad faith under section 1307(c) where the bankruptcy court failed to consider an advice of counsel defense and where the bankruptcy court seemingly faulted the debtor for not appearing personally for a status hearing in the case. In that case, the Debtor violated a Local Rule due to erroneous advice of counsel, an issue that was specifically raised.

The case at bar is distinguishable for multiple reasons. First, the Debtor did personally appear and testified at the hearing. The defendants did not appear personally, and they were not specifically ordered to appear. However, this was not a mere status conference like in *Sugar*— these were two expedited hearings granted at the request of the defendants and the Debtor, both of which were filed by the same attorney. The Motion to Convert placed the issue of bad faith before the Court, expressly referring to it on page two of the Motion. Second, by arguing for conversion based in part on the granddaughters' contributions and willingness to chip in, it was foreseeable that the granddaughters' testimony might be needed for the hearing, particularly given that no funding agreement or other mechanism to substantiate the speculative funding from the granddaughters existed in the record. Third, the Court reiterates that the defendants and the Debtor

have the same counsel, and this is not a case where counsel misinterpreted a local or legal rule and advised the client in accordance with a good faith misunderstanding. Any argument that the defendants or the Debtor were not aware of the Additional Stay Requirements is completely undercut by the Trustee's email to counsel on March 25, 2025, which counsel responded to, but nevertheless still chose not to comply with the Additional Stay Requirements. Nothing else exists in the record for the Court to separate the decisions of the defendants or the Debtor from their counsel. Finally, the Court is not dismissing the case but instead is considering the denial of a motion to convert to chapter 13.

Accordingly, the Court finds that based on the record before it that the Debtor engaged in bad faith conduct, atypical of the honest but unfortunate debtor that the Bankruptcy laws were enacted to protect. In particular, the Court bases this finding on the fraudulent transfer that occurred prepetition, the Debtor's subsequent dishonesty that was exposed between her deposition testimony and later declaration, and the timing and circumstances of the Second Stay Motion and Motion to Convert. In sum, the Debtor's actions during the prepetition period and during the chapter 7 phase of this case were at minimum, dishonest, and at worst, fraudulent. Both circumstances, which prejudice creditors and demonstrate an abuse of the Bankruptcy system, establish that this Debtor presents precisely the atypical and extraordinary case that warrants the Court's denial of the Motion to Convert. As a result, the Court will deny the Motion to Convert.

Based on the foregoing, the Court will enter separate orders denying both the Motion to Convert and Second Stay Motion.

The Clerk shall docket this Memorandum Opinion in both the Main Case and the Adversary Proceeding and provide copies of this Memorandum Opinion to all counsel of record.

Date: May 29 2025

/s/ Klinette H Kindred

Hon. Klinette H. Kindred
United States Bankruptcy Judge

Entered On Docket:May 30 2025